UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 18 CR 743-2 |
| v. ) | |
| ) | Judge John Z. Lee |
| COREY LOGSDON ) | |

**UNITED STATES POSITION PAPER AS TO SENTENCING FACTORS**

Defendant Corey Logsdon schemed to defraud the Illinois Department of Employment Security ("IDES") out of millions of dollars. Between 2013 and 2015, defendant and his co-schemers stole hundreds of identities to repeatedly file and certify false claims and take government funds intended for others in need. A sentence of imprisonment within the guidelines range of 41 to 51 months is appropriate, followed by a two-year consecutive term for aggravated identity theft.

I.  **DEFENDANT'S BACKGROUND AND OFFENSE CONDUCT**

The background is taken from the Presentence Investigation Report (PSR), which incorporates the factual basis in defendant's plea agreement.

A.  **Defendant's Personal Background and Criminal History**

Defendant was born in the Chicago area and raised primarily by his mother, with whom he has a close relationship. PSR ¶¶ 75, 82. His parents separated when he was a child, and his father died when he was a teenager. PSR ¶ 80. At age 18, defendant was arrested and convicted of theft in two separate incidents. PSR ¶¶ 57-58. He was also arrested several times between ages 18 to 26 for theft, criminal

1

trespass to vehicles, driving under the influence, and possession of an assault weapon/aggravated assault. PSR ¶¶ 68-73.

Defendant finished high school and two semesters of college, and began to focus on art and design. PSR ¶¶ 102-05. He began his own clothing line in 2011 in Richton Park, before moving to Los Angeles, where he continued to pursue art and clothing. PSR ¶¶ 106-07. He is currently in a relationship that began in 2016, after the conduct giving rise to this offense. PSR ¶ 81.

**B.    Offense Conduct**

Defendant participated in a scheme to submit fraudulent unemployment insurance claims to IDES using identities that were stolen from a doctor's office ("Heath Care Provider A"). The roles of the charged defendants are as follows. Ashley Weathersby worked at Health Care Provider A and sold personal identification information of hundreds of patients to defendant and other co-schemers. PSR ¶ 13. Defendant was introduced to Weathersby by Yoshimi Henry, and began paying Weathersby for her stolen identities. PSR ¶ 26.

Defendant, Brandon Pitts, and Angelo Steele all used those identities to file fraudulent unemployment insurance claims on the IDES website. PSR ¶¶ 13, 16. Defendant brought Steele into the scheme around February 2014, by introducing him to Weathersby. PSR ¶ 15. Defendant and Steele then shared batches of identities with each other to perpetuate the scheme. PSR ¶ 21. In total, the scheme involved the identities of 892 individuals. PSR ¶ 16. The total potential IDES payout of all the claims submitted in the scheme was approximately $8.8 million. PSR ¶ 19. Of that amount, IDES paid out approximately $1.5 million. *Id.*

2

When the fraudulent claims were submitted, defendant, Pitts and Steele needed to provide residential addresses for IDES to mail out debit cards with the benefits, without implicating themselves or getting flagged for fraudulent claims. PSR ¶ 16. Co-defendants Korey Isbell, Kewan Watts, and Yoshimi Henry filled that gap by providing addresses that defendant and Pitts could use to direct the debit cards. PSR ¶ 13. Defendant, Pitts, and Watts, and Isbell then retrieved the debit cards and used them at ATMs to withdraw IDES benefits in the form of cash. PSR ¶ 14. Defendant paid Henry to obtain the addresses he used. PSR ¶ 42. Henry also recruited others to provide addresses and paid those individuals on behalf of defendant. *Id.*

Of the claims that defendant submitted, the actual loss to IDES was approximately $141,556. PSR ¶ 20. The government agrees that this amount determines the applicable loss amount under the law of the case, based on the Court's ruling in the sentencing of co-defendant Pitts. PSR ¶ 38.

In addition to using the stolen identities to defraud an unemployment program, defendant also financed high-end vehicles using stolen names. PSR ¶ 26. The fraudulent vehicle purchases included three Mercedes, two Audis, and a Jaguar. *Id.* Defendant paid to have one of those Mercedes shipped to his residence in Los Angeles. *Id.*

## II.    THE PSR GUIDELINE RANGE

Defendant objects to two provisions of the PSR that affect the calculation of the Guidelines range: the three-point enhancement for manager/supervisor under

3

Guideline 3B1.1(a), and the assessment of two criminal history points for his April 2006 theft convictions. PSR ¶¶ 43, 57-58.

### A. Manager/Supervisor Enhancement

Defendant argues that he was not a manager or supervisor under the Guidelines because "the individuals in the case worked together, and there was no hierarchy of leadership." R. 451 at 3-4. Defendant contends that "nobody reported" to him and he "did not direct anyone to commit unlawful acts" because they were participating "for their own benefit and at their own direction." *Id.* at 4. This enhancement is appropriate, however, because it does not require that defendant controlled others in a hierarchy, but only that he managed or supervised other participants' illegal activity.

Pursuant to Guideline § 3B1.1(a), a 3-level enhancement is appropriate where the defendant was a manager or supervisor of a criminal activity that involved five or more participants, or was otherwise extensive. *United States v. Lovies*, 16 F.4th 493, 506 (7th Cir. 2021) (a defendant is a "supervisor" or "manager" in a criminal enterprise if he "tells people what to do and determines whether they've done it.")

This scheme required a high degree of coordination among the seven defendants and others, and defendant organized the other moving parts in a way that other defendants did not. In managing the scheme, defendant obtained addresses through Henry and others, arranged the mailing of debit cards to those addresses, coordinated the return of the mail received at those addresses by others, and coordinated payments to those mail recipients for their services. PSR ¶ 22. When law enforcement searched defendant and Pitt's residence in May 2014, they found debit

4

cards in the name of Health Care Provider A's patients with internet histories showing that they were used for IDES claims. PSR ¶ 23. The cell phones showed calls to the IDES telephonic certification number and the Chase IDES activation number. *Id.* There were also lists of at least 58 names with their personal identifying information. PSR ¶ 24. Given the number of identities and steps involved, the scheme involved multiple participants, was extensive, and required the management and supervision of schemers like defendant and Pitts.[1]

Defendant supervised at least one co-defendant, Yoshimi Henry, and Henry recruited others who also provided their addresses to receive fraudulent debit cards. PSR ¶ 42. As the Seventh Circuit has explained, "the defendant's criminal organization is not required to have a formal structure for the role enhancement to apply" and "defendant need only control one other participant in the criminal conspiracy to qualify for the enhancement." *Lovies*, 16 F.4th at 506. As a result, "the role enhancement can apply in even an amorphous, poorly defined criminal organization." *Id.*

Defendant played a role in managing the scheme at every step—obtaining the identities, filings and certifying the false claims, directing the debit cards to co-schemers' addresses, picking the debit cards up, and withdrawing money. The offense involved the management of dozens of false identities, and coordination among more than seven participants, who were playing different roles. *See United States v. Dade*,

---

[1] As in the Pitts sentencing, the government is seeking a three-level enhancement for manager/supervisor rather than the four level enhancement for organizer or leader under Guideline § 3B1.1(a) set forth in the plea agreement.

5

787 F.3d 1165, 1167 (7th Cir. 2015) (holding that 2-level enhancement was appropriate where defendant "organized the offense by obtaining false documents and referring buyers to the codefendant loan officers").

### B. Defendant's Criminal History Score

Defendant objects to his Criminal History Category II, arguing that his two April 12, 2006 theft convictions were imposed on the same day *and* "occurred from the same set of facts" without "an intervening arrest." R. 451 at 2. Guideline Section 4A1.2(a)(2) states that "[p]rior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense)." The PSR states that the arrests for the two thefts were on January 1, 2006 and January 27, 2006. PSR ¶¶ 57, 58. The facts of the two arrests are different. In the first arrest, defendant was caught with stolen purses that had been removed from the victim's residence, along with a guitar amplifier that defendant took to a pawn shop. PSR ¶ 57. In the second arrest, defendant was in possession of a stolen camcorder, which he admitted he knew was stolen and that he was selling it on eBay. PSR ¶ 58. Although the sentences for both thefts were imposed on the same day, there were separate case numbers, separate arrests, and separate sets of facts. Accordingly, each conviction receives a criminal history point under Guideline Section 4A1.2(a)(2).

### III. A SENTENCE WITHIN THE GUIDELINES RANGE IS APPROPRIATE

Defendant's Guidelines range of 41 to 51 months is conservatively calculated. His loss amount is limited to (a) the actual amount that IDES paid out for (b) claims tied directly to him. As with Pitts, defendant is not being held responsible for the

6

potential loss under an intended loss theory. He is not being held responsible for the claims of submitted by Pitts and Steele, even though he was aware that they were submitting claims and helped facilitate Weathersby's role in selling them stolen identities. The total loss to IDES was approximately $1.5 million, which is much greater than the $141,556 in actual loss for claims that he is directly tied to. PSR ¶¶ 19-20. The government agrees with the PSR in following the Court's ruling in the Pitts case in determining defendant's loss amount, given that the relevant facts are not materially different. Using that loss amount, however, does not result in an overstated Guidelines range, and a below-Guidelines sentence would be inappropriate.

The nature and circumstances of the offense are very serious. The scheme – and defendant's role in it – involved fraudulently obtaining IDES funds, money that was intended to support individuals in Illinois who were unemployed and needed IDES assistance to replace lost income. Fraud on IDES diverts money from legitimate claimants – people who have lost their jobs – to people, like defendant, who have no legitimate claim to the funds. Ultimately, that fraud adds significant costs for IDES and Illinois taxpayers, and impacts the operation of the entire system of unemployment benefits. *See United States v. Wilson*, 960 F.2d 48, 50–51 (7th Cir. 1992) ("Prosecuting those who defraud state unemployment compensation programs is an important means for protecting the government's investment by ensuring that those programs are run with a minimum of waste and fraud.").

7

Equally as importantly, defendant knowingly participated in a scheme to defraud IDES using the names and information of unsuspecting identity theft victims. He also used IDES debit cards in the names of multiple people he did not know to withdraw funds from ATM machines. Defendant knew that those names were the names of real people whose identities were stolen in order to allow him and his co-schemers to fraudulently obtain significant amounts of cash. The additional two-year term required in an aggravated identity theft case is appropriate because it addresses this distinct harm.

Defendant's crime involved greed, deception, and a disregard of consequences that could result to individuals and an entire system established to assist people in the community. Accordingly, the seriousness of the offense demands a Guidelines sentence.

In addition to evaluating the nature of offense and the history and characteristics of the defendant, the sentence must "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A)-(C). Here, a sentence within the applicable Guidelines range is necessary under section 3553(a), because anything less will denigrate the seriousness of defendant's offenses, will not promote respect for the law by defendant or other would-be offenders, will not provide just punishment for the offenses, and will not protect the public from this type of fraud in the future.

8

Had this fraud not been discovered by law enforcement, it likely would have continued indefinitely, harming more and more individuals, the IDES unemployment benefit system, and the federal treasury upon which so much depends. Without a significant sentence, defendant and others like defendant will fail to appreciate the harm this type of crime causes to institutions and individuals, and will continue to see the allure of fraudulently obtained money. The amount of government money that has been distributed during the pandemic has only confirmed the need to vigilantly protect it for who it is intended for. A guideline sentence will recognize that by promoting respect for the law and providing just punishment for the offense.

### IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant within the Guidelines range of 41 to 51 months imprisonment, followed by a consecutive term of two years, and order a two-year period of supervised release consistent with the goals of criminal punishment.

Respectfully Submitted,

JOHN R. LAUSCH, JR.
UNITED STATES ATTORNEY

By: /s/ *Charles W. Mulaney*
CHARLES W. MULANEY
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn Street
Chicago, Illinois 60604
(312) 469-6042

Dated: July 1, 2022

9